IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MICHAEL M. GOLDBERG, M.D.** <br><br> Plaintiff <br><br> v. <br><br> **NAVIDEA BIOPHARMACEUTICALS, INC.** <br><br> and <br><br> **MACROPHAGE THERAPEUTICS, INC.** <br><br> Defendants. | Case No.: |

## COMPLAINT

Plaintiff Michael M. Goldberg, M.D. ("Plaintiff" or "Dr. Goldberg"), complains of the Defendants, Navidea Biopharmaceuticals, Inc. ("Navidea"), and Macrophage Therapeutics, Inc. ("Macrophage"), for breaching their contractual obligations.

## PARTIES

1. Plaintiff Dr. Goldberg is an adult individual and resident of the State of New Jersey. Before resigning, he served as an officer and director of Navidea. Currently, Dr. Goldberg is a director of Macrophage, but was recently dismissed as the company's Chief Executive Officer ("CEO").

2. Defendant Navidea is a corporation organized and existing under the laws of the state of Delaware, and having its principle place of business in Ohio. Navidea is a publicly-traded corporation listed on the New York Stock Exchange American ("NYSE").

3.      Defendant Macrophage is a subsidiary of Navidea, organized and existing under the laws of the state of Delaware, and having its principle place of business in Ohio.

## NATURE OF THE ACTION

4.      This is a civil action for breach of an Agreement between Dr. Goldberg, Navidea and Macrophage, entered into on August 14, 2018, or – in the alternative – for breach of a Promissory Note assigned to Dr. Goldberg for debt owned by Navidea, which is immediately due and owing.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this case under 28 U.S.C. § 1332, which confers original jurisdiction on federal district courts to civil actions involving citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

6.      Dr. Goldberg is a citizen of New Jersey, whereas Navidea and Macrophage are citizens of Delaware and Ohio and the amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs.

7.      Venue is proper under 28 U.S.C. § 1391(b)-(c), because a substantial part of the events giving rise to Plaintiff's claim occurred in this district and county.

8.      Personal jurisdiction exists over Dr. Goldberg, Navidea and Macrophage because (a) the parties agreed that any claims under the contracts upon which Dr. Goldberg's claims are based shall be brought exclusively in the federal and state courts located in New York, New York, and (b) each party regularly transacts business within New York.  *See* Exhibits A and D

## FACTS

*Background*

9. Prior to August 15, 2018, Goldberg, was the largest single shareholder of Navidea; held essentially all of Navidea's outstanding debt; and served as Navidea's Director, President and CEO.

10. Dr. Goldberg (a) founded Macrophage on or about February 6, 2015; (b) arranged the initial funding for the venture; and (c) served as the company's Chairman of the Board and CEO since its inception until his purported termination in February 2019.

11. Dr. Goldberg received Series A Preferred Shares of Macrophage in exchange for his capital contributions, which are convertible to Shares of Common Stock under certain defined circumstances.

12. Dr. Goldberg, as the holder of Macrophage Series A Preferred Shares, has the right to convert his accrued initial investment and accrued interest into Macrophage Common Stock at the same valuation as the next investor; the total value of outstanding Series A Preferred Stock is in excess of $1 million.

13. Currently, Jed Latkin, CEO of Navidea, asserts that Macrophage has become insolvent – a claim that Dr. Goldberg and the Series A Preferred Shareholders dispute.

14. An investment sufficient to offset Macrophage's liabilities, which are only extant because Navidea has refused to honor its contractual obligations, would result in the Series A Preferred Shareholders gaining ownership of over fifty percent (50%) of Macrophage's equity on an as converted basis.

15. As of March 2015, Navidea held the exclusive license to certain patent rights as developed by The Regents of the University of California ("University").

16.    Macrophage entered into a Sub-License Agreement ("Sub-License Agreement") with Navidea, effective March 11, 2015, wherein Navidea granted to Macrophage an exclusive sub-license to therapeutic methods and products under the licensed patents, patent applications, know-how, trade secrets and other proprietary rights, including the exclusive right to develop therapeutics with the technology (collectively "IP"); the initial Preferred Shareholders of Macrophage, who provided the start-up capital, required the Sub-License Agreement.

17.    Both Navidea and Goldberg agreed that Goldberg was uniquely qualified to drive the development and commercialization of the IP licensed to and acquired by Macrophage.

18.    Specifically, both Navidea and Goldberg agreed that Macrophage occupied the best position to develop the IP, and to attract the interest of various investors so long as Macrophage established an independent identity from Navidea, which included formation of a separate and independent Board of Directors.

*Platinum Loan Agreement and Note*

19.    On or about July 25, 2012, Platinum-Montaur Life Sciences LLC ("Platinum-Montaur") entered into a loan agreement with Navidea (the "Platinum Loan Agreement"), where Platinum-Montaur committed to extend up to $15 million in debt to Navidea in the first year with the possibility of additional capital available in subsequent years.  A true and correct copy of the Platinum Loan Agreement and Note, dated July 25, 2012, is attached hereto as Exhibit "A"

20.    Contemporaneously with the execution of the Platinum Loan Agreement, Navidea delivered a Promissory Note, also dated July 25, 2012, to Platinum-Montaur (the "Platinum Note").  *See* Exhibit A

21. The Platinum Note was amended several times, the last of which was the Third Amended and Restated Promissory Note, dated May 15, 2015.

22. Under the Platinum Note, Navidea agreed to pay Platinum-Montaur the lesser of either (i) $35,000,000 or (ii) the collective amount of all Draws, including accrued interest and other charges, advanced to Navidea by Platinum under the Platinum Loan Agreement. *See* Exhibit A.

23. Under the terms of the Platinum Notes, Platinum-Montaur (as well as, its successors and assigns) could freely transfer the instrument "in whole or in part."

24. Platinum Partners Value Arbitrage Fund L.P. ("PPVA") held 99.9% ownership of Platinum-Montaur as of September 29, 2017.

25. Dr. Goldberg managed Platinum-Montaur from 2007 through 2013, and was responsible for all Platinum's Navidea equity and debt investments.

26. Sometime in 2016, the Financial Services Division of the Grand Court of the Cayman Islands ("Cayman Court") appointed Martin Nicholas John Trott and Barnett Kennedy as Liquidators of PPVA (collectively, "Liquidators").

27. PPVA was an investment fund that invested in various industries, including biotechnology and life sciences.

28. Platinum-Montaur, as a subsidiary of PPVA, conducted business from the offices of Platinum Management in New York ("PMNY") until the Liquidators were appointed.

29. In its filings with the Securities and Exchange Committee ("SEC") and elsewhere, Navidea acknowledges (i) the existence of the Platinum Note and (ii) Dr. Goldberg's assigned interest in that Note.

30. Effective March 28, 2014, and amended effective June 11, 2015, Platinum-Montaur and Dr. Goldberg entered into a Separation Agreement (the "Platinum Separation Agreement").

31. The Platinum Separation Agreement provides, *inter alia*, "for the transfer to Dr. Goldberg of a 15% interest in the [Platinum] Loan Agreement [and Platinum Note.]" A true and correct copy of PPVA's Filing with the SEC dated April 27, 2016 is attached hereto as Exhibit "B"

32. PPVA and its subsidiaries, including PMNY, acknowledged the assignment of a portion of the Platinum Loan and Platinum Note to Dr. Goldberg in a filing before the SEC dated April 27, 2016. *See* Exhibit B at 11 of 12 ("After reasonable inquiry and to the best of its knowledge and belief, the undersigned [including representatives for PPVA and PMNY] each certifies that the information with respect to it set forth in this statement is true, complete and correct.").

33. Furthermore, in December 2016, correspondence between Dr. Goldberg and the Platinum entities (including PPVA and PMNY) confirm that a portion of the Platinum Note was transferred to Dr. Goldberg. A true and correct copy of the December 1, 2016 email correspondence is attached as Exhibit "C"

34. In an email sent on December 1, 2016, David Steinberg, the Chief Operating Officer of Platinum L.P. (the parent company of the Platinum entities) acknowledged to Jed Latkin that Platinum-Montaur and/or PMNY had assigned a portion of the Platinum Note to Dr. Goldberg. At the time, Latkin was Navidea's Interim Chief Operating Officer and Chief Financial Officer. Specifically, Steinberg writes the following to Latkin:

> Jed – based on the attached calculations, the outstanding balance on the notes is as follows:

1. as of Nov 20, 2016:
    a. Platinum - $7,720,053
    b. Michael Goldberg - $1,646,245
2. For every day during the month of Dec that the note remains outstanding daily interest accrues in the amount of:
    a. Platinum - $1,754
    b. Michael Goldberg - $645
3. as of Dec 21, 2016:
    a. Platinum - $7,824,949.52
    b. Michael Goldberg - $1,665,623.66
4. For every day during the month of Jan 2017 that the mote remains outstanding daily interest accrues in the amount of:
    a. Platinum - $1,766.05
    b. Michael Goldberg - $653
5. as of Jan 31, 201[7]:
    a. Platinum - $7,877,930.95
    b. Michael Goldberg - $1,685.229.44

Please take direction from Michael on how he wants his note treated.  Platinum wants its note repaid from the Cardinal deal.

*See* Exhibit C

35. In August of 2018, Dr. Goldberg entered into negotiations with Navidea, *inter alia*, (a) to resign as an officer and director of Navidea, and (b) to take control of the development of the therapeutic technology, together with the patented delivery system design, through control of the independent subsidiary Macrophage.

36. The negotiations resulted in an Agreement between Dr. Goldberg, Macrophage and Navidea, wherein Navidea expressly recognized Dr. Goldberg's interest in Navidea's debt under the Platinum Note.  A true and correct copy of the Agreement, dated August 14, 2018 (the "August 14th Agreement") is attached hereto as Exhibit "D"

*Navidea's Default of the Platinum Note*

37. On February 19, 2019, Jed Latkin – the current CEO of Navida – sent a letter to Dr. Goldberg, the CEO of Macrophage, "terminating the [Sub-License] Agreement pursuant to

Section 8.1(b)(i) of the Agreement" with "[t]he effective date of termination … [on] March 1, 2019."  A true and correct copy of Navidea's Sub-License Termination Letter, dated February 19, 2019, as Exhibit "E"

38.     Latkin explained that Navidea had decided to terminate the Sub-License Agreement under Section 8.1(b)(i), which provides: "LICENSOR [Navidea] may terminate this Agreement by delivering the LICENSEE [Macrophage] a written notice of termination at least ten (10) days prior to the date of termination if (i) LICENSEE becomes insolvent…"  *See* Exhibit E, pp. 13 (Section 8.1(b)(i)).

39.     Notably, Navidea did not disclose Macrophage's apparent insolvency in its public filings with the SEC.

40.     Under Section 7.1 of the Platinum Loan Agreement and Platinum Note, an "Event of Default" occurs when "Borrower and/or any Guarantor becomes insolvent or commences any Insolvency Proceeding[.]"  *See* Exhibit A, pp. 31 of 55.

41.     The definition of "Guarantor" includes "all Significant Subsidiaries of the Borrower (other than any Foreign Subsidiary), whether now existing or hereafter created or acquired[.]"  *See* Exhibit A, pp. 13 of 55.

42.     The preamble of the Platinum Loan Agreement and Platinum Note defines Navidea as the "Borrower[.]"  *See* Exhibit A, pp. 9 of 55.

43.     Accordingly, Navidea triggered an "Event of Default" when its CEO, Jed Latkin, terminated the Sub-License Agreement granted to its subsidiary, Macrophage, based upon insolvency.  *See* Exhibit E, pp. 13 (Section 8.1(b)(i)).

44.     Under Section 7.2, following Navidea's default, "the principal of the Draws [under the Platinum Note], together with accrued interest thereon and all fees and other

Obligations shall automatically become due and payable without any presentment, demand, protest or other notice of any kind[.]" *See* Exhibit A, pp. 32 of 55.

*Agreement of August 14, 2018*

45. Navidea, Macrophage and Dr. Goldberg entered into an Agreement, dated August 14, 2018 (the "August 14th Agreement," Exhibit D), which memorialized, *inter alia*, (i) Dr. Goldberg's resignation as an officer and director of Navidea, and (ii) Navidea's promise to grant Dr. Goldberg control of Macrophage and its Board of Directors through 5.0% ownership of the subsidiary in the form of "MT Super Voting Common Stock."

46. Navidea was represented by counsel during the negotiations and execution of the August 14th Agreement, whereas Dr. Goldberg represented himself.

47. Specifically, Bill Mower of Maslon in Minneapolis, MN represented one special committee ("First Special Committee") of the Navidea Board of Directors, which was composed of Michael Rice and Claudine Bruck.

48. At this time in August 2018, Dr. Mark Greene ("Dr. Greene") and Dr. Goldberg served as both (i) the other two Navidea Board members, and (ii) the only two members of Macrophage's Board of Directors.

49. Dr. Goldberg and Dr. Greene, however, recused themselves from voting upon the August 14th Agreement on either Navidea or Macrophage's behalf.

50. After the Navidea Board approved the August 14th Agreement, Jed Latkin signed the Agreement on behalf of Navidea, and Dr. Goldberg signed on behalf of Macrophage.

51.    Dr. Goldberg agreed, *inter alia*, "to hereby resign[] as an officer and director of Navidea and any other subsidiary of Navidea other than [Macrophage] on the date of execution of this Agreement[.]"  *See* Exhibit D

52.    Effective as of August 14, 2018 – the day the August 14th Agreement was executed – Dr. Goldberg resigned (i) as President and CEO of Navidea, and (ii) as a member of Navidea's Board of Directors.

53.    Dr. Goldberg further agreed to sever all other ties with Navidea, which included resolving and settling all the outstanding debt owed by Navidea to Goldberg under the Platinum Note, and allowing Navidea to satisfy all of Goldberg's outstanding severance and wage claims, thereby leaving Goldberg as only a passive investor in Navidea – albeit, still remaining as the largest single shareholder of Navidea.  *See* Exhibit D

54.    In consideration for Dr. Goldberg's assent to the August 14th Agreement, Navidea and Macrophage agreed to provide Dr. Goldberg with full voting control of Macrophage, thus allowing him to control, manage and drive the development of the IP to which Macrophage holds an exclusive sub-license.  *See* Exhibit D

55.    Specifically, Macrophage agreed to "issue to Goldberg shares of [Macrophage]'s Super Voting Common Stock ("MT Super Voting Common Stock") in a number equal to 5.0% of the total outstanding shares of [Macrophage].  Except as otherwise required by law, the holders of MT Super Voting Common Stock shall be entitled to notice of any stockholders' meeting and to vote as a single class with the holders of the Common Stock upon any matter submitted to the stockholders for a vote.  In that regard, each holder of MT Super Voting Common Stock shall have 20 votes for each full share of [Macrophage]'s Common Stock into

which the shares of MT Super Voting Common Stock would be convertible on the record date for the matter to be voted on…" *See* Exhibit D

*Breach of August 14th Agreement by Navidea and Macrophage*

56. Macrophage and Navidea have failed to satisfy their obligations to Dr. Goldberg under the August 14th Agreement.

57. The language of the August 14th Agreement contemplated that Dr. Goldberg, Macrophage and Navidea would execute other "Transaction Documents" to effectuate the promises and agreements contained in the August 14th Agreement. *See* Exhibit D

58. The August 14th Agreement, however, specifies without any ambiguity that the parties' obligations under the Agreement are valid and enforceable irrespective of whether the parties subsequently execute additional "Transaction Documents." *See* Exhibit D ("Upon execution, the terms of such Transaction Documents shall supersede the terms set forth herein, but any subsequent failure to execute the Transaction Documents shall not render the provisions of this Agreement invalid.")

59. First, Navidea removed Dr. Greene from Macrophage's Board of Directors and replaced him with Bruck and Rice, which violated both the terms of the August 14th Agreement and the language of Macrophage's By-laws requiring a 60-day period of observation for the addition of new directors.

60. Under the August 14th Agreement, Navidea was "[only] entitled to appoint one observer to [Macrophage]'s Board of Directors, who will receive all notices of board meetings, written consents and board materials in advance of such meetings." *See* Exhibit D

61. Navidea's lone observer to Macrophage's Board was not entitled to have voting authority.

62. Therefore, after Dr. Goldberg resigned his positions with Navidea in reliance on the August 14th Agreement, Navidea unilaterally and impermissibly altered the composition of Macrophage's Board of Directors – transforming Macrophage from what was intended to be an independent subsidiary to ostensibly a captive of Navidea.

63. Navidea and Macrophage took further actions to breach the terms of their August 14th Agreement with Dr. Goldberg.

64. Navidea refused to issue 23.5 million shares of Navidea common stock (18.5 million at the time of execution and an additional 5 million by January 2, 2019) under Regulation D of the Securities Act of 1933.

65. In October through November of 2018, Navidea and its representatives exchanged various correspondences and communications with Dr. Goldberg regarding its discussion with the NYSE.

66. After the August 14th Agreement was executed, Navidea's attorney committed to providing Dr. Goldberg with the "Transaction Documents" contemplated.

67. Navidea's attorney, however, failed to provide any documents to Dr. Goldberg until September 7, 2018.

68. At the same time, Navidea refused to issue the mandated 18.5 million shares of Navidea common stock under Regulation D of the Securities Act of 1933, or to take any actions necessary to satisfy the terms of the August 14th Agreement until Dr. Goldberg signed all so-called "Transaction Documents" – documents that the August 14th Agreement specified were not required to enforce all terms and conditions.

69. The so-called "Transaction Documents" provided by Navidea's attorney on September 7, 2018, were an extensive over reach as compared to the terms reflected in the parties' August 14th Agreement.

70. Navidea refused repeated attempts by Dr. Goldberg and Macrophage's attorneys to close the various "Transaction Documents."

71. Navidea continued to delay until admitting in late October that the NYSE voiced concerns with the deal structure under the August 14th Agreement, specifically as it related to the issuance of Navidea Common Stock under Regulation D.

72. Notably, the August 14th Agreement did not require the approval of the NYSE as a delineated term or provision; nevertheless, in the interest of cooperation, Dr. Goldberg agreed to work with Navidea to address the apparent problem.

73. While working with Goldberg on solutions that addressed the problem of NYSE approval, Navidea refused to move forward with either (i) the closing date for the issuance of MT Super Voting Common Stock, or (ii) the issuances of the required Navidea Common Stock under Regulation D, as required by the August 14th Agreement.

74. Ultimately, Navidea asserted that it was unable to issue the 23.5 million shares under Regulation D and maintain its status with the NYSE.

75. Instead of honoring the terms of the parties' mutual Agreement, Navidea (i) demanded that Dr. Goldberg accept a significantly reduced quantity of Navidea Common Stock shares, and (ii) refused to issue the MT Super Voting Common Stock to Dr. Goldberg – which was required to provide him with voting control of Macrophage – unless he accepted the new offer.Navidea, therefore, refused to comply with the negotiated terms of the August 14th Agreement, and simply issued 18.5 million shares to Dr. Goldberg – but *not* pursuant to

Regulation D, as required; instead these shares were encumbered with legends and other constraints, which vastly exceeded the terms of the August 14th Agreement.

76. Navidea also did not offer to compensate Dr. Goldberg in other respects for its refusal to issue the shares under Regulation D.

77. Likewise, Navidea and Macrophage continued to refuse issuance of the MT Super Voting Common Stock to Dr. Goldberg, thus denying Dr. Goldberg voting control of Macrophage.

78. Dr. Goldberg had resigned as an officer and director of Navidea primarily for the opportunity to acquire voting control of Macrophage – and, specifically, the development control of the therapeutic methods and IP Sub-Licensed to Macrophage.

79. As a result of the breaches by Navidea and Macrophage, Dr. Goldberg no longer occupied his positions with Navidea, nor did he receive the benefits he bargained for under the August 14th Agreement.

80. Similarly, by refusing Dr. Goldberg control of Macrophage, Navidea has made it nearly impossible for the subsidiary to obtain the outside investment necessary to develop the IP and therapeutic methods which it holds under the Sub-License Agreement.

81. Dr. Goldberg was also damaged for the loss of his time, labor and expertise spent developing and marketing products for Navidea and Macrophage, as he was not compensated for his full-time efforts on behalf of Macrophage, and Navidea's actions irreparably damaged his investment in Macrophage's Series A Preferred Stock.

# COUNT I

## PLAINTIFF V. NAVIDEA

### BREACH OF CONTRACT

82. Plaintiff hereby incorporates by reference paragraphs 1 through 80 above as though fully set forth herein.

83. The Platinum Loan and Platinum Note is a valid, binding and enforceable contract between Dr. Goldberg and Navidea,

84. As explained in greater detail above, the Platinum Note is a promissory note assigned to Dr. Goldberg wherein Navidea owes a debt of $2.78 million.

85. Navidea has defaulted under the terms of the Platinum Note and, therefore, the debt is immediately due and owing.

86. According to the filings of Navidea's subsidiary Macrophage in the Delaware Chancery Court, the August 14th Agreement is not enforceable.

87. In its Verified Complaint, Macrophage alleged, " [a]mong other reasons, because no definitive transaction documents have been executed and Navidea has not consented to any such issuance, Macrophage has had no enforceable obligation to issue the shares of Super Voting Stock of Macrophage to Goldberg under the [August 14th] Agreement." *See* Macrophage's Verified Complaint, 2/20/2019, at ¶23 (Del. Ch., Case No. 2019-0137-JRS).

88. Dr. Goldberg fully performed his obligations under the Platinum Loan and Platinum Note.

89. Navidea has no legal basis to refuse payment of the amount owed to Dr. Goldberg under the Platinum Loan and Platinum Note.

90.     Navidea breached its contractual obligations under the Platinum Loan and Platinum Note by refusing to pay the amount due and owing to Dr. Goldberg when Navidea terminated the Sub-License Agreement with Macrophage due to the alleged insolvency of the subsidiary – a delineated "<u>Event of Default</u>."

91.     To the extent that the August 14th Agreement is not enforceable, Navidea's debt to Dr. Goldberg is currently and immediately due and owing, and Navidea's refusal to make the required payment constitutes a breach of the Platinum Loan Agreement and Platinum Note.

92.     Specifically, under Section 7.1 of the Platinum Loan Agreement and Platinum Note, Navidea's termination of the Sub-License Agreement with Macrophage due to the subsidiary's purported insolvency constitutes an "<u>Event of Default</u>."

93.     Navidea's breaches of the Platinum Loan Agreement and Platinum Note – as well as, the specific Event of Default – are continuing as of the date of commencement of this action as a result of Navidea's continuing refusal to honor its contractual obligations.

94.     Dr. Goldberg has been damaged in excess of $2.78 million as the proximate result of Navidea's breach of the Platinum Loan Agreement and Platinum Note described in this Complaint, not including legal fees and other costs and expenses incurred.

## COUNT II
## PLAINTIFF V. ALL DEFENDANTS
## <u>BREACH OF CONTRACT</u>

95.     Plaintiff hereby incorporates by reference paragraphs 1 through 81 above as though fully set forth herein.

96. The August 14th Agreement is a valid, binding and enforceable contract between Dr. Goldberg, Navidea and Macrophage.

97. Dr. Goldberg fully performed his obligations under the August 14th Agreement up to and until he was unable to do so as a result of the breaches by Navidea and Macrophage.

98. Navidea has no legal basis to refuse to perform its obligations under the August 14th Agreement, including (i) issuance of 23.5 million shares of Navidea common stock under Regulation D of the Securities Act of 1933, and (ii) issuance of MT Super Voting Common Stock in a number equal to 5.0% of all outstanding shares of Macrophage common stock.

99. Macrophage has no legal basis to refuse to perform its obligations under the August 14th Agreement, including issuance of MT Super Voting Common Stock in a number equal to 5.0% of all outstanding shares of Macrophage common stock.

100. Navidea breached its contractual obligations under the August 14th Agreement by refusing (i) to issue of 23.5 million shares of Navidea common stock under Regulation D of the Securities Act of 1933, (ii) to issue MT Super Voting Common Stock in a number equal to 5.0% of all outstanding shares of Macrophage common stock; (iii) by removing Dr. Greene from the Macrophage Board, and replacing him with Michael Rice and Claudine Bruck; and (iv) by Rice and Bruck's improper termination of Dr. Goldberg as CEO of Macrophage – an action undertaken by an improperly installed Board of Directors.

101. Macrophage breached its contractual obligations under the August 14th Agreement (i) by refusing to issue of MT Super Voting Common Stock in a number equal to 5.0% of all outstanding shares of Macrophage common stock; (ii) by removing Dr. Greene from the Macrophage Board, and replacing him with Michael Rice and Claudine Bruck; and (iii) by

Rice and Bruck's improper termination of Dr. Goldberg as CEO of Macrophage – an action undertaken by an improperly installed Board of Directors.

102. In addition, Macrophage's purported insolvency – as specified by Jed Latkin in Navidea's letter terminating the Sub-License granted to Macrophage – constitutes an "<u>Event of Default</u>" under the Platinum Loan Agreement and Platinum Note.

103. Navidea's breaches of the August 14th Agreement – as well as, the Event of Default related to the underlying debt obligation owed by Navidea to Dr. Goldberg via the Platinum Loan Agreement and Platinum Note – are continuing as of the date this action commences.

104. Under the August 14th Agreement, Dr. Goldberg had agreed to discharge the debt Navidea owed to him under the Platinum Loan Agreement and Platinum Note; however, this debt in excess of $2.78 million is now due and owing and a component of damage relating to Navidea's breach of the August 14th Agreement.

105. Dr. Goldberg has been damaged in excess of $8.25 million as the proximate result of Navidea and Macrophage's breaches described in this Complaint, not including legal fees and other costs and expenses incurred.

## REQUESTED RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(1) Awarding Dr. Goldberg damages in an amount to be determined at trial, but not less than $5.5 million

(2) Awarding Dr. Goldberg punitive damages in an amount to be determined at trial;

(3) Awarding Dr. Goldberg attorneys' fees and costs; and

(4) Awarding Dr. Goldberg such other and further relief that this Court deems just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all claims set forth herein.

          Respectfully submitted,

          /s/ *Gregory Zimmer*
          Gregory Zimmer, Esq.
          360 Lexington Avenue, Suite 1502
          New York, NY 10017
          Phone: 914.402.5683
          Fax: 914.402.5683
          Email: GZimmer@GZimmerLegal.com

          Shawn M. Rodgers, Esq.
          *Pro Hac Vice* (Pending)
          GOLDSTEIN LAW PARTNERS, LLC
          11 Church Road
          Hatfield, PA 19440
          Phone: 610.949.0444
          Fax: 610.296.7730
          Email: srodgers@goldsteinlp.com

          *Attorneys for Defendant Michael M.*
          *Goldberg, M.D.*